GARY TEACHERS UNION LOCAL NO. 4 *v.* SCHOOL CITY OF GARY ET AL.

[No. 472A211. Filed June 28, 1972. Rehearing denied August 11, 1972. Transfer denied May 8, 1973.]

*Hilbert L. Bradley,* of Gary, for appellant.

*William J. Regan,* of Merrillville, for appellees.

SHARP, J.—This is an action for Declaratory Judgment brought by the Plaintiffs-Appellees as Trustees of the School City of Gary, Indiana, against the Gary Teachers Union, Appellant-Defendant.[1] The complaint alleges that an agreement was executed between the parties covering the period from February 1, 1970, through December 31, 1971. The relevant provisions of said agreement are as follows:

---

1. This case was transferred to the Court of Appeals for determination by our Supreme Court on April 28, 1972.

"A-Definitions

(1) Teachers shall mean any person within the scope of the bargaining unit employed by the Board or any number of teachers within the scope of the bargaining unit similarly affected by grievance.

(2) A grievance is defined as an allegation that there is a lack of policy; that a policy or practice is improper or unfair, or that there has been a vioaltion of the agreement and/or written Board and personnel policy covering established practices of teachers covered by this agreement and/or establishes local working conditions or practices in effect at the time of the signing of this agreement, and not inconsistent with this agreement. Each written grievance shall cite the specific alleged violation. * * *

B-Four-Stage Grievance Procedure

(1) First Stage: Any teacher who believes that he has a a justifiable grievance may request an informal meeting with his principal or his designated representative, with or without the union building representative for his school being present, as the teacher may elect, with a view to arriving at a mutually satisfactory resolution of the complaint. In the event a group of teachers is involved, a small representative group of such teachers may be present, if they so desire. The principal, or his designated representative, shall schedule a meeting to be held within three (3) days after the teachers request.

Differences which the parties are unable to resolve informally may be presented in writing to the principal by the Union Building Representative. Such grievance shall be dated and signed by the aggrieved teacher and the Union Building Representative. When all teachers, or a group of teachers, in a school or subdivision of that school are involved, the Building Represenative shall sign the grievance and shall identify the group involved.

At any meeting during the informal or formal stage one, if either party believes assistance is necessary, he may request such assistance and the parties shall meet at a mutually agreeable time. The request for such an assistance shall not relieve the principal and the build-

ing representative from the responsibility of settling the issues.

Within five (5) [sic] after presentation of the grievance in writing to the principal, said principal shall submit his decision in triplicate, together with the supporting reasons to the Union Building Representative.

(2) Second State: If the grievance is not resolved at the first stage, the Union may request, in writing, a meeting with the Superintendent of Schools or his designated representative. Such meetings shall be requested with five (5) days of the receipt of the decision in stage one (1). The Superintendent or his designated representative shall set a date for said meeting within three (3) days of the receipt of the request and shall notify the Union of this date at least two (2) days in advance of the meeting. The meeting shall take place within ten (10) days of the receipt of this request. Within seven (7) days after the said meeting the Superintendent or his designated representative, shall submit his decision in triplicate, together with supporting reasons of the Union.

At this meeting and in any meeting at succeeding stages of this procedure, the Superintendent or his designee and the Union shall have the right to have in attendance any person they deem necessary for proper discussion of the grievance.

(3) Third Stage: Optional on the part of the Union. The American Arbitration Association shall be the source of the arbitrator when needed. Selection of the arbitrator shall follow the procedure outlined by the American Arbitration Association unless it is mutually agreed that the American Arbitration Association select the arbitrator. The cost of the arbitrator shall be defrayed as follows: one-half by the teacher and/or Union, and one-half by the School City.

If the grievance is not resolved at the second state, the Union may appeal from the determination of the second stage, as outlined under this procedure, upon written notice within seven (7) days after the receipt of the determination made by the Superintendent of Schools or his designated representative. The appeal shall be taken by submitting to the AAA, with a copy to the Superintendent of Schools, a written statement signed by the designated representative of the Union, which statement shall contain:

(a) The name, residence, address, and school or department of employment of the parties involved in the grievance as well as the teachers' representative.

(b) A request that the AAA take the necessary action for the selection of an arbitrator, the setting up of a hearing, and the rendering of a decision on a grievance which was not resolved at the second stage of the grievance procedure.

(c) A statement of the nature of the grievance up to the appeal, and all other pertinent documents, exhibits and information.

The arbitrator shall hold a hearing within thirty (30) calendar days after receiving this written request. The arbitrator shall give at least ten (10) calendar days notice of the time and place of such hearing to the Union and the Superintendent. The arbitration hearing shall be held in private unless mutually agreed that it is to be a public hearing. The arbitrator shall not be bound by formal rules of evidence; however, normal cross-examination rights will be maintained.

A stenographic record shall be kept of the entire hearing before the arbitrator. The cost of such stenographic records shall be defrayed as follows: one-half by the teacher and/or Union, and one-half by the School City.

The arbitrator shall with thirty (30) calendar days after the close of the hearing submit his decision, together with his findings of fact, conclusions, and recommendations, to the Union and Superintendent.

Whatever action is required in order to implement the decision of the arbitrator shall be taken within fifteen (15) days of the receipt of the arbitrator's decision unless the Board exercises its option to take the grievance to the fourth stage.

(4) Fourth State: If the grievance is not resolved at the second stage, the Union may request a meeting with the Board of School Trustees. Such meeting shall be requested within seven (7) days of the receipt of the decision in stage two. The board shall set a date for said meeting within fifteen (15) days of the receipt of the request and shall notify the Union of

this date at least two (2) days in advance of the meeting. The meeting shall take place within ten (10) days of the setting of the date. The Board shall submit its decision, in writing, together with supporting reasons to the Union within seven (7) days following said meeting.

The Board may within fifteen (15) days of the receipt of the decision of the arbitrator notify the Union in writing that it will hold a meeting to consider the grievance. Such meeting shall be held within ten (10) days of the expiration of the fifteen (15) days following the issuance of the arbitrator's decision. The Board shall submit its decision, in writing, together with supporting reasons to the Union within seven (7) days following said meeting.

In the event that none of the foregoing procedures is successful in achieving a mutually satisfactory resolution of the grievance, the Union reserves the right to pursue any legal remedy, not inconsistent with this agreement, which it shall deem appropriate."

After the Appellant answered the complaint in admission and denial, a trial was had on the merits resulting in a declaratory judgment for the Appellees-Plaintiffs. The Appellant-Defendant has properly perfected this appeal therefrom.

The above quoted provisions from the contract in question are in the nature of provisions for what is generally classified as compulsory or binding arbitration. The trial court determined that such provisions are not authorized under the statutory or case law of the State of Indiana.

We are thus confronted with another aspect of the ongoing legal evolution of the rights and responsibilties that exist between public employees and public employers.

At the outset all parties agree that it is now the settled law of the State of Indiana that School teacher public employees cannot strike. *Anderson Federation of Teachers Local 519* v. *The School City of Anderson, et al.*, 252 Ind. 558, 251 N. E. 2d 15 (1970), opinion on rehearing, 254 N. E. 329 (1970), cert. den., 26 L. Ed. 2d 794 (1970).

The *Anderson* case was concerned solely with the right of a teacher employed in the public schools of the State of Indiana to engage in a strike. A careful examination of both of the opinions of our Supreme Court will reveal that none of the essential issues necessary to decide this case were present in the *Anderson* case. Thus the *Anderson* case stands at one end of the spectrum and delineates a certain area of impermissible conduct limited to school teacher public employees.

At the other end of that spectrum is a statute of the State of Indiana which delineates certain impermissible conduct on the part of public employers of school teacher public employees. In Acts 1965, ch. 299, § 1, IC 1971, 20-6-20-2, Ind. Ann. Stat. § 28-4536 (Burns 1970 Repl.), it is provided:

> "Abridging or infringing upon the rights and privileges of teachers unlawful — Injunctive relief — Exception. — It shall be unlawful for any public school corporation in the state of Indiana to dismiss or suspend any employee of such corporation because of any affiliation with or activity in any organization, provided that said organization does not advocate the overthrow of the government of the United States by force or the use of violence or the violation of law to achieve its objective. Any ruling or regulation contrary to the spirit and wording of this provision shall be null and void and of no effect.
>
> It shall be unlawful to dismiss, suspend or enforce a mandatory leave of absence upon any teacher in the public schools as a result of his candidacy for any pubic office unless evidence shall be submitted to the board that would substantiate a reasonable finding that his activity has impaired his effectiveness in his service in the schools or interfered with the proper carrying out of his contractual obligations as a professional employee of the public school system and any suspension shall be valid only during the period of such impaired activity.
>
> Any teacher in the public schools whose rights and privileges as prescribed in this act [§§ 28-4506, 28-4536, 28-4537] are or are about to be abridged or infringed upon by any such rule or rules is hereby granted recourse at law by way of, and in accordance with the law governing injunctions, an action seeking to enjoin the school corporation from continuing to so abridge or infringe; and the circuit

and superior courts of this state are hereby authorized and directed to issue such injunction in instances where the court finds that the rights and privileges referred to herein have been or appear about to be abridged or infringed upon."

It is therefore without question that teacher employees in the State of Indiana have a statutory right to belong to and to engage in the activities of a teachers labor union.

However, there is no constitutional or statutory duty on the public employer of such a school teacher public employee to bargain collectively with the elected representatives of such school teacher public employees in the absence of a specific statute imposing such a duty. Indiana has no such statute. The question then in this case narrows to whether a public school corporation as a public employer has the permissible authority to bargain with and contract with public school teacher employees in the manner which was attempted here. Such authority, if it exists, must be found or reasonably inferred from the statutes of the State of Indiana.

We must now turn our attention to two such statutes. The first is Acts 1965, ch. 307, referred to as the Indiana General School Powers Act, IC 1971, 20-5-1-1, Ind. An. Stat. § 28-1701 et seq. (Burns 1970). It is necessary to cite and quote several sections of the Indiana General School Powers Act.

On general powers the Indiana General School Powers Act states:

"28-1709. General powers and purposes.—Each school corporation shall have the power to conduct an educational program for all children resident within such school corporation in kindergarten and in grades 1 through 12, to conduct an educational program for adults and children over the age of fourteen [14] years not attending such first mention program, to provide in either such program instruction in vocational, industrial or manual training, to provide a special education program for handicapped children as permitted by law, to provide libraries for the schools of such school corporation, to provide public li-

braries open and free for the use and benefit of the residents and taxpayers of the school corporation where permitted by law, to provide vacation school and recreational programs, and to conduct such other educational or other activities as shall be permitted or required to be performed by law by any school corporation. Such powers shall be construed as purposes as well as powers."

There are also certain specific powers which are relevant:

"28-1710. Specific powers.—In carrying out the school purposes of each school corporation, its governing body acting on its behalf shall have the following specific powers:

\* \* \*

(2) To take charge of, manage and conduct the educational affairs of the school corporation and to establish, locate and provide the necessary schools, school libraries, other libraries where permitted by law, other buildings, facilities, property and equipment therefor.

\* \* \*

(7) To employ, contract for and discharge superintendents, supervisors, principals, teachers, librarians, business managers, superintendents of buildings and grounds, janitors, engineers, architects, physicians dentists, nurses, accountants, teacher aides performing non-instructional duties, educational and other professional consultants, data processing and computer service for school purposes, including but not limited to the making of schedules, the keeping and analyzing of grades and other student data, the keeping and preparing of warrants, payroll, and similar data where approved by the state board of accounts as provided below, and such other personnel or services, all as the governing body considers necessary for school purposes; to fix and pay the salaries and compensation of such persons and such services; to classify such persons or services and to adopt schedules of salaries or compenation; to determine the number of such persons or the amount of services thus employed or contracted for; and to determine the nature and extent of their duties.

The compensation, terms of employment and discharge of teachers shall, however, be subject to and governed by the laws relating to employment, contracting, compensation and discharge to teachers; and the compensation, terms of employment and discharge of bus drivers shall be subject to and shall be governed by any laws relating to employment,

contracting, compensation and discharge of bus drivers. The forms and procedures relating to the use of computer and data processing equipment in handling the financial affairs of such school corporation shall be submitted to the state board of accounts for approval to the end that such services shall be used by the school corporation when the governing body determines that it is in the best interests of the school corporation while at the time providing reasonable accountability for the funds expended.

* * *

(19) To exercise any other power and make any expenditure in carrying out its general powers and purposes provided in sec. 201 [§ 28-1709] or in carrying out the powers delineated in this sec. 202 which is reasonable from a business or educational standpoint in carrying out school purposes of the school corporation, including but not limited to the acquisition of property or the employment or contracting for services, even though such power or expenditure shall not be specifically set out herein; and the specific powers set out in this section shall not be construed to limit the general grant of powers provided in sec. 201 [§ 28-1709] except where a limitation is set out in this act by specific language or by reference to other law."

On the subject of limitation on powers the Act states:

"28-1711. Limitation on powers.—All powers delegated to the governing body of each school corporation under sec. 201 [§ 28-1709] or 202 [§ 28-1710] shall be subject to all the laws subjecting the school corporation to regulation by state agencies, including but not limited to the superintendent of public instruction, state board of accounts, Indiana state police, state administrative building council, state board of tax commissioners, stream pollution control board, state school bus committee, state fire commission, state board of health and any local governmental agency to which the state has been delegated a specific authority in matters, other than educational matters and other than finance, including but not limited to planning commissions, zoning boards and boards dealing with health and safety."

The proper interpretative attitude toward this statute is expressed in one of its provisions which states:

"28-1751. Construction of act.—This act [§§ 28-1701—28-1761] shall be liberally construed to permit the governing body of school corporations to conduct its affairs

in a manner consistent with sound business practice to the ends that the authority of the governing body shall be clarified and that it shall be permitted to operate with the maximum efficiency consistent with accountability."

In regard to the scope and reach of the Indiana General School Powers Act in *Salem Community School Corporation* v. *Easterly* (1971), 150 Ind. App. 11, 275 N. E. 2d 317, 322, we stated:

"The General School Powers Act is the broad grant of authority to the public school authorities in the State of Indiana 'to prepare, make, *enforce * * *'* (our emphasis) rules and regulations pertaining to the operation of the public schools in the State of Indiana. The legislature cannot effectively confer upon school authorities power to conduct schools and to make all rules necessary for the orderly process of education, yet deny them the power to effectively enforce such rules. One of the most elementary enforcement devices is the suspension or expulsion of a student. The authority granted the school officials in the General School Powers Act is board enough to authorize the public school officials to promulgate certain reasonable rules and regulations for the conduct of students in the public schools and to provide, in appropriate cases, for the expulsion of students for violations of such reasonable rules and regulations. This grant of authority is broad enough to authorize public school officials to expel a student under the age of sixteen years for a violation of reasonable rules and regulations."

See also *Cooper* v. *Huntington County Community School Corporation Board of Trustees* (1968), 249 Ind. 653, 233 N. E. 2d 887.

We must next turn to Acts 1969, *et seq.*, as found in Ind. Ann. Stat. § 3-228, *et seq.* (Burns 1971), known as the Uniform Arbitration Act. The relevant section is found in Ind. Ann. Stat. § 3-228 (Burns 1971), IC 1971, 34-4-2-1, which states:

"Validity of arbitration agreement.— (a) A written agreement to submit to arbitration is valid, and enforceable, an existing controversy or a controversy thereafter arising

is valid and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. If the parties to such an agreement so stipulate in writing, the agreement may be enforced by designated third persons, who shall in such instances have the same rights as a party under this act [§§ 3-227—3-248]. *This act also applies to arbitration agreement between employers and employees or between their respective representatives (unless otherwise provided in the agreement.)*

(b)  This act specifically exempts from its coverage all consumer leases, sales, and loan contracts, as these terms are defined in the Uniform Consumer Credit Code. (our emphasis)

We deem it significant that agreements between employers and employees or between their respective representatives is explicitly *included* in this act in the same section that makes a specific *exclusion*. The rationale of the *Anderson* case is not broad enough in its reach to exclude, as a matter of law, an agreement between employers and employees where the employee is a public school teacher public employee from the coverage of the Uniform Arbitration Act. The Uniform Arbitration Act became effective on August 18, 1969, which was subsequent to the time of the controversy in the *Anderson* case. Further, there is no indication that any consideration was given to the possible application of the Uniform Arbitration Act in the *Anderson* case. Likewise there is no indication that the scope and reach of the Indiana General School Powers Act was in any way considered in the *Anderson* case.

It is not for this court to decide whether the kind of agreement here in question is wise. For this limitation upon our powers we can be grateful. We must, however, decide whether it is legally permissible under the statutes of the State of Indiana, including the Indiana General School Powers Act and the Uniform Arbitration Act. We think it is legally permissible. This certainly does not infer that we think that the governing board of every school corporation in the State of Indiana should or must

execute such an agreement. Quite to the contrary. However, the governing boards of school corporations in the State of Indiana are currently harassed with many difficult and seemingly insoluble problems. We believe that the Indiana General School Powers Act passed in 1965 and the Uniform Arbitration Act passed in 1969 together are broad enough to *permit* the governing bodies of school corporations in the State of Indiana to exercise, as one of many options, the type of agreement here involved. We hold that such broad policy option is implicit in both of the above cited statutes.

The evidentiary record in this case discloses that the Appellee School Board has been entering into collective bargaining agreements with employees which contain binding arbitrary clauses of one kind or another with some of its employees at least since 1954. (One witness testified that such was done as early as 1950). In one case the operation of an entire school in a head-start type educational operation was a subject of a contract containing a collective bargaining and binding arbitration procedure. There is also evidence that similar agreements existed in the public school system of East Chicago and Hammond, Indiana. While these items do not determine the legal issues here they are illustrative of the surrounding reality of this case.

Although we do not deem it necessary to here rely on authorities from other jurisdictions which have been confronted with similar problems, there are decisions in other jurisdictions in which the reasoning and result are consistent with the one reached here.

In Illinois the Appellate Court held that a board of education *could* enter into collective bargaining with public school teacher employees without express legislative authority and that an agreement resulting from the same was not contrary to public policy. See *Chicago Association, et al.* v. *Board*

*of Education, et al.* (1966), 71 Ill. App. 2d 456, 222 N. E. 2d 243.

Also in *Norwalk Teachers Association* v. *Board of Education* (1951), 138 Conn. 269, 83 Atl. 2d 484, 31 A. L. R. 2d 1133, the court held that public employees school teachers could be given the right to limited arbitration.

See also *Civil Service Forum* v. *New York City Transit Authority*, 4 A. D. 2d 117, 163 N. Y. S. 2d 476 (1957) and *International Brotherhood of Electrical Workers* v. *Town of Farmington*, 75 N. M. 393, 405 Pac. 2d 233 (1965).

In fact it seems that the stautory authority in Indiana, based upon the above two cited statutes, is considerably broader in this regard than the statutory authority reflected in the Illinois, Connecticut, New York and New Mexico cases.

The trial court construed the Indiana General School Powers Act and the Uniform Arbitration Act too narrowly. We must and hereby do reverse this case with instructions to the trial court to grant the Defendant-Appellant a new trial and for other proceedings consistent herewith.

Staton, J., concurs; Hoffman, C.J., dissents with opinion.

## DISSENTING OPINION

HOFFMAN, C.J.—I see the issues in this case as two-fold. The first, not answered by the majority opinion, is whether a school board may bargain collectively with a teachers' union. The second is whether a school board may enter into an agreement with the representatives of a group of teachers providing for binding arbitration of disputes.

The Indiana General School Powers Act, IC 1971, 20-5-1-1, Ind. Ann. Stat. § 28-1701, *et seq.* (Burns 1970), is controlling in this appeal. The particularly pertinent sections of this Act are as follows:

"28-1710. Specific powers.—In carrying out the school purposes of each school corporation, its governing body acting on its behalf shall have the following specific powers:

\* \* \*

"(2)   To take charge of, manage and conduct the educational affairs of the school corporation and to establish, locate and provide the necessary schools, school libraries, other libraries where permitted by law, other buildings, facilities, property and equipment therefor.

\* \* \*

"(7)   To employ, contract for and discharge superintendents, supervisors, principals, teachers, \* \* \*.

"The compensation, terms of employment and discharge of teachers shall, however, be subject to and governed by the laws relating to employment, contracting, compensation and discharge to teachers; \* \* \*."

"28-1751.   Construction of act.—This act [§§ 28-1701— 28-1761] shall be liberally construed to permit the governing body of school corporations to conduct its affairs in a manner consistent with sound business practice to the ends that the authority of the governing body shall be clarified and that it shall be permitted to operate with the maximum efficiency consistent with accountability."

The above statutes can only be interpreted to say that the governing body [school board] of a school corporation is charged with the duty to manage and conduct the educational affairs of the school corporation. We are here dealing with one of the most basic, cherished and protected rights— the education of our children. The duty of the school board to manage the school corporation is an obligation conferred by law. Such obligation cannot be shared or delegated in any manner.

This legal duty imposed on the school board by the Indiana General School Powers Act must co-exist with the rights of public school teachers. I.C. 1971, 20-6-20-1, Ind. Ann. Stat. § 28-4536 (Burns 1970), recognizes the right of public school teachers to join and belong to labor unions.

The first issue is whether a school board may bargain collectively with a teachers' union.

It is well-setled that public employees do not have the same collective bargaining rights as do private employees. *Anderson Fed. of Teach.* v. *School City of Anderson* (1969), 252 Ind. 558, 251 N. E. 2d 15. Many jurisdictions have taken the position that absent express statutory provision, a public official may not engage in collective bargaining with public employees. *International U. of Op. Eng., Loc. 321* v. *Water Works Bd.* (1964), 276 Ala. 462, 163 So. 2d 619; *International Bro. of Elec. Wkrs.* v. *City of Hastings* (1965), 179 Neb. 455, 138 N. W. 2d 822; *Fellows* v. *LaTronica* (1962), 151 Col. 300, 377 P. 2d 547. See also: 31 A. L. R. 2d 1142, and cases there cited.

Other jurisdictions have taken a dissimilar but not wholly inconsistent view. In *Norwalk Teachers' Asso.* v. *Board of Education* (1951), 138 Conn. 269, 83 A. 2d 482, 31 A. L. R. 2d 1133, at 1140, the court stated:

> "There is no objection to the organization of the plaintiff as a labor union, but if its organization is for the purpose of 'demanding' recognition and collective bargaining the demands must be kept within legal bounds. What we have said does not mean that the plaintiff has the right to organize for all of the purposes for which employees in private enterprise may unite, as those are defined in § 7391 of the General Statutes. Nor does it mean * * * that it shall be the exclusive bargaining agent for all employees of the unit. * * * [T]he plaintiff may organize and bargain collectively for the pay and working conditions which it may be in the power of the board of education to grant.
>
> * * *
>
> "The statutes and private acts give broad powers to the defendant with reference to educational matters and school management in Norwalk. If it chooses to negotiate with the plaintiff with regard to the employment, salaries, grievance procedure and working conditions of its members, there is no statute, public or private, which forbids such negotiations. It is a matter of common knowledge that this is the method pursued in most school systems large enough to support a teachers' association in some form. It would seem to make no difference theoretically whether the negotiations are with a committee of the whole association or with individuals or small related groups, so long as any agree-

ment made with the committee is confined to members of the association. If the strike threat is absent and the defendant prefers to handle the matter through negotiation with the plaintiff, no reason exists why it should not do so. The claim of the defendant that this would be an Illegal delegation of authority is without merit. The authority is and remains in the board."

The court went on to say that the school board and the teachers' union could legally engage in limited arbitration.

In *Minneapolis Fed. of Teachers Local 59* v. *Obermeyer* (1966), 275 Minn. 347, 147 N. W. 2d 358, the court was asked to decide the constitutionality of the Pubilc Employees Labor Relations Act which *excepted* public school teachers from its operation. At 351 of 275 Minn., at 362 of 147 N. W. 2d, the Supreme Court of Minnesota commented on the Act as follows:

"It is unnecessary to go into the various provisions of c. 839 except to say that in substance it provides for a collective bargaining arrangement for meaningful negotiations subject to the limitation that it does not insure binding arbitration—a limitation inherent in the nature of governmental employment. The act reaffirms denial of the right to strike; affirms the right of public employees to form and join labor or employee organizations; and provides for the election of a representative who may bargain and treat with agency heads as the representative of all employees if the organization represents a majority of the employees."

And, further, at 359-360 of 275 Minn., at 366-367 of 147 N. W. 2d:

"The next point raised is whether the school board has implied power to conduct an election and bargain with elected representatives of teacher organizations. The school board possesses only such powers as are granted by statute. Board of Education v. Sand, 227 Minn. 202, 34 N. W. 2d 689. There is no authority, either express or implied, by which the school board can hold an election for the purpose of designating an exclusive representative of the teachers.

\* \* \*

"There is nothing to prevent the heads of governmental agencies from meeting with, or discussing wages, hours, and conditions of employment with, groups or individuals representing groups of the employee class.

\* \* \*

"It would appear that even without express statutory authority, there is nothing to prevent collective bargaining when it is entered into voluntarily and no prohibitory state statute exists."

In the instant case, we are required to interpret the Indiana General School Powers Act liberally. In managing the affairs of the school corporation a school board may lawfully choose to discuss or negotiate with teachers singly or in a group. A representative of a group of teachers may negotiate in their behalf so long as such representative negotiates only for the particular teachers who have given authority to the representative. However, there are no means by which a school board can choose to recognize an exclusive bargaining representative of all members of the bargaining unit. Therefore, a school board has no authority to bargain collectively, or collectively contract with a teachers' union.

The second issue is whether a school board has authority to enter into an agreement for binding arbitration of disputes with the representative of a group of teachers.

As heretofore stated, the Indiana General School Powers Act imposes the legal obligation to conduct the affairs of the school corporation on the school board. Binding arbitration, although it may be a desirable facility in some instances, would remove the decision-making power from the school board and give it to a third party. Such result was not the intendment of the statute. I do not think the Uniform Arbitration Act can be applied here as the result would be to abrogate the Indiana General School Powers Act.

The judgment of the trial court should be affirmed.

NOTE—Reported in 284 N. E. 2d 108.